## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| ANDREW FOSS,<br><br>                    Plaintiff<br><br>v.<br><br>CIRCUIT CITY STORES, INC.,<br><br>                    Defendant | Civil No. 06-153-P-S |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Andrew Foss brought the instant action against his former employer Defendant Circuit City Stores, Inc. ("Circuit City") alleging hostile work environment sexual harassment in violation of Title VII (Count I), 42 U.S.C. § 2000e-2(a)(1) and retaliation in violation of Title VII (Count II), 42 U.S.C. § 2000e-3(a).  Plaintiff claims that his direct supervisor, John Lounsbury, created a hostile work environment by continuously commenting on women's bodies or discussing topics of a sexually explicit nature for the six weeks that they worked together at the Keene, New Hampshire Circuit City store.  Now before the Court is Defendant's Motion for Summary Judgment, which asserts that the record does not generate a genuine issue of material fact on either claim. (Docket # 25.) After a thorough review of the affidavits, depositions, answers to interrogatories, and other exhibits submitted in connection with the instant motion, the

Court concludes that Defendant is entitled to summary judgment on Count I, but not on Count II.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)). The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni, 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a

trialworthy issue warrants summary judgment to the moving party."  In re Spigel, 260

F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## II. FACTS

The parties' statements of material facts, credited to the extent either admitted or

supported by record citations in accordance with Local Rule 56, viewed in the light most

favorable to Foss and resolving all reasonable inferences in Foss's favor, reveal the

following.[1]  Rosenberg v. City of Everett, 328 F.3d 12, 17 (1st Cir. 2003).

In October 2004, Andrew Foss completed an online employment application for a

sales position with Circuit City.[2]  (Foss Dep. at 23.)  Later in October, Circuit City hired

Foss as an entertainment sales associate at its South Portland, Maine store.  (Foss Dep. at

34-35.)  Foss's duties as an entertainment sales associate included assisting customers

with the purchase of consumer electronic products and equipment.  (Foss Dep. at 43-44;

Affidavit of Kenneth Dionne ¶ 9.)  Foss's duties also included following Circuit City's

polices and procedures, such as reporting on time for his scheduled shifts and accurately

recording his hours worked.  (Dionne Aff. ¶ 10; Affidavit of Lisa Hopkins ¶ 7; Circuit

City "Associate's Handbook.")

After working at Circuit City for almost a year, in September 2005, Foss

requested a transfer to the Circuit City store in Keene, New Hampshire so he could be

---

[1] Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement.  See Loc. R. 56(c)-(d).  The concept of "qualification" presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information.  Except to the extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, the Court has deemed it admitted.

[2] Circuit City is a corporation headquartered in Richmond, Virginia and is engaged in the business of selling consumer electronics and related goods and merchandise.  (Dionne Aff. ¶ 2.)

closer to the college he was attending.[3]  (Foss Dep. at 44; Dionne Aff. ¶ 6.)  Foss was told that he would be allowed to transfer; however, the Keene store was not scheduled to opening until the end of October, so Foss was first assigned to the Manchester, New Hampshire store.  (Foss Dep. at 44.)

To keep track of their work hours, Circuit City associates either "swipe" their I.D. cards into the computer system, which automatically records the time they begin their shift, or their time is manually entered.  (Hopkins Aff. ¶ 15.)  After starting at the Manchester store, Foss swiped his I.D. card to automatically sign him into the system and record his time, but the computer system did not recognize him.  (Foss Dep. at 88.)  Foss spoke to his manager Josh Dean about not being able to automatically punch into the system.  (Foss Dep. at 88-89.)  Dean told Foss that he probably had not been transferred in the system and then Dean manually entered Foss's arrival on his time record.  (Foss Dep. at 88-89.)  Within a few weeks, Foss was told he could manually enter the time into the computer on his own time record until he was formally entered into the system.  (Foss Dep. at 89.)

Foss started at the Keene store on October 28, 2005.  The Director for the Keene store was Kenneth Dionne ("Dionne").  (Foss Dep.  at 45; Dionne Aff. ¶ 6.)  Dionne remained Foss's store Director throughout Foss's employment at the Keene store.  (Dionne Aff. ¶ 5.)  John Lounsbury ("Lounsbury") worked as the sales manager of the entertainment department at the Keene store and served as Foss's immediate supervisor.[4]

---

[3]  At the time of Foss's transfer, he worked in the position of senior entertainment sales associate.  (Foss Dep. at 44-45.)  Foss's duties as a senior entertainment sales associate were the same as for an entertainment sales associate, but it reflected his greater experience and knowledge of Circuit City's products and services.  (Foss Dep. at 45.)

[4]  Although Lounsbury served in the position of sales manager of the entertainment department at the Keene store, he did not have the authority to hire, fire, promote, or reassign any associate, or change any

(Dionne Aff ¶ 12; John Lounsbury Aff. ¶ 3; Foss Dep. at 47.)  The operations manager during the time of Foss's employment at the Keene store was Lisa Hopkins ("Hopkins"). (Dionne Aff. ¶ 30; Hopkins Aff. ¶¶ 1, 4.)  Tracy Tobolski ("Tobolski") was Circuit City's District Human Resources Manager assigned to the Keene store during Foss's employment there.  (Tobolski Aff. ¶¶ 3, 16.)

After starting at the Keene store, Foss continued to manually enter his arrival and departure times on his timesheets.  (Foss Dep. at 86-89.)  Circuit City's computer system displays the time of the day so associates who manually record their time into the computer will know the exact time when they arrive.  (Hopkins Aff. ¶ 16.)  However, when working at the Keene store, Foss did not make a practice of immediately entering his arrival time on his timesheet.  (Foss Dep. at 96.)  Rather, after arriving for a shift, he would check in with his manager – Dionne or Lounsbury – and talk about sales or the other shifts and then at some point in the shift he would enter his arrival time into the system.  (Foss Dep. at 96.)

From October 28 through December 17, 2005, Foss worked with Lounsbury on 19 days.  (Foss Dep. at 50.)  The record is in dispute on Lounsbury's conduct during this time, however, viewing the evidence in the light most favorable to Plaintiff, the record supports the following facts.  Lounsbury constantly made sexual comments about female customers and, specifically, commented on their breasts, legs and buttocks.  (Foss Dep. 54-55, 70.)  Lounsbury would also make jokes to Foss about obese women, saying he felt sorry for their husbands.  (Foss Dep. at 54-55.)  If an attractive woman came into the department, Lounsbury would talk about his desire to be single or wished he was not

_____

associate's salary or benefits with respect to his/her employment at Circuit City.  (Dionne Aff. ¶ 13; Hopkins Aff. ¶ 11; Lounsbury Aff. ¶ 7.)

married.   (Foss Dep. at 83-84.)   Lounsbury often described his sexual habits and experiences to Foss.   (Foss Dep. at 53, 71.)   The sexual comments Lounsbury made spanned the entire six weeks that Foss worked with him at the Keene store.   (Foss Dep. at 60.)

In addition to this generalized conduct, Foss recounts specific instances of Lounsbury's inappropriate conversations.   Indeed, Foss recalls that Lounsbury's vulgar commentary began immediately after he started working at the Keene store.   For example, at the "friends and family night" celebrating the grand opening of the Keene store, Lounsbury made inappropriate comments to other employees about a woman he thought was Foss's girlfriend.   (Foss Dep. at 51.)   After Foss showed Lounsbury a picture of his girlfriend, Lounsbury commented that she looked very Irish and stated that Irish women were whores, that "he dated Irish women and that they were just as bad as dating crazy black Jamaican women."   (Foss Dep. at 56.)   On another occasion, Lounsbury picked up a piece of product wrap and walked up to a female employee saying Foss's girlfriend has lips like the product wrap.   (Foss Dep. at 52.)   Lounsbury then gestured toward his crotch.   (Foss Dep. at 52.)   On another occasion, Foss described a woman to Lounsbury who was taking a bartending class with Foss.   Lounsbury recognized the woman and said that one of his friends had dated her.   Lounsbury then described the woman's pubic hair and how she shaved it.   On at least two other occasions, Lounsbury again made sexual comments about the female bartender and Foss again told Lounsbury that he did not want to hear it.   (Foss Aff. ¶ 13.)   On another occasion, Lounsbury told Foss that if his wife knew the number of women he had slept with and the "stuff" he had done with them, she would not be married to him.   (Foss Dep. at 53, 71.)   Lounsbury also

told Foss that when he was in the Navy he would go from port to port, sleeping with women of different races and ethnic backgrounds and described his sexual experiences. (Foss Dep. at 71.)

Foss repeatedly made it clear to Lounsbury that he found the comments disgusting, and he did not want to hear it. (Foss Dep. at 53.) Despite making his position clear to Lounsbury, Foss found it difficult to avoid being subjected to the harassment. (Foss Dep. at 52-53, 71.) Foss was not alone in having to listen to Lounsbury's crude remarks. Laura Mann was present for Lounsbury's vulgar commentary. (Foss Dep. at 52; Plaintiff's Response to Defendant's First Set of Interrogatories at Nos. 15, 16, and 17.) Other associates may have also been exposed to Lounsbury's conduct. (Plaintiff's Response to Defendant's First Set of Interrogatories at Nos. 15 and 17.)

The record is also in dispute on this point, however, viewing the evidence in the light most favorable to Plaintiff, the record supports the following facts. Foss first told Dionne that he was uncomfortable working with Lounsbury because of Lounsbury's sexual commentary in late November or early December 2005. (Foss Dep. at 61-62.) Dionne replied: "You know, John is John, and that's how he is."[5] (Foss Dep. at 62.) A short time later, Foss gave Dionne his two-week notice explaining that he did not feel

---

[5] The Associate's Handbook contains a description of the Company's policies prohibiting discrimination, harassment (including sexual harassment), and retaliation. (Associate's Handbook at 6-7.) Circuit City's Associate's Handbook is available in electronic format to all associates on the company's Intranet website. (Dionne Aff. ¶ 46; Tobolski Aff. ¶ 9.) In addition to the Associate's Handbook, Circuit City has written policies including "It's A Matter Of Respect" policy, "Equal Employment Opportunity and Discrimination" policy, "Harassment Policy," and "Open Door Policy." (Exs. 8-11.) These policies prohibit discrimination, harassment, and retaliation and set forth procedures for reporting any such violations of Company policy. (Exs. 8-11.) Circuit City's policies prohibiting discrimination, harassment, and retaliation and set forth procedures for reporting such violations of Company policy are available to all associates on the Company's Intranet website. (Dionne Aff. ¶ 49; Tobolski Aff. ¶ 14.) Foss was aware of Circuit City's policies prohibiting discrimination. (Foss Dep. at 39.) Foss was also aware of Circuit City's prohibition on unlawful sexual harassment and procedures for reporting unlawful sexual harassment and retaliation. (Foss Dep. at 39.)

comfortable working with Lounsbury because of the way he spoke about women.  (Foss

Dep. at 63-64.)  Dionne apparently agreed but again responded: "John is John."  (Foss

Dep. at 63-64, 68-69.)  Later, Foss also told Tobolski in human resources that he had

complained to Dionne about Lounsbury's sexual comments.  (Foss Dep. at 75.)

In early December 2005, Foss asked Dionne for a transfer back to the South

Portland store.[6]  (Dionne Aff. ¶ 23; Dionne Dep. at 35-36; Tobolski Aff. ¶ 44; Foss Aff. ¶

5.)  When Dionne failed to immediately approve his transfer, Foss called Tobolski and

left her a voice mail message indicating that he did not want to work with Lounsbury

because of his harassing behavior and stating that Dionne had refused to approve his

request for a transfer.  (Foss Dep. at 75-77; Tobolski Aff. ¶ 44.)  At some later date, Foss

and Tobolski spoke over the telephone about Foss's request to transfer to South Portland.

(Foss Dep. at 76; Tobolski Aff. ¶ 44.)  Following the call from Foss, Tobolski spoke with

Dionne and, after discussing the issue, Dionne agreed to permit Foss to transfer to the

South Portland store.  (Foss Dep. at 78; Tobolski Aff ¶ 46; Dionne Aff. ¶ 26.)

Later that day, Dionne went looking for Foss in the store to tell him his transfer

request was approved but was unable to locate him despite the fact that Foss was

scheduled to be working.  (Dionne Dep. at 30-31; Dionne Aff. ¶ 27.)  Dionne then asked

Lounsbury to find Foss.  (Dionne Aff. ¶ 28; Lounsbury Aff. ¶ 11.)  Lounsbury was also

unable to find Foss, so he checked the computer and determined that Foss had not

clocked into work yet.  (Lounsbury Aff. ¶¶ 12, 13.)  A short time later, Lounsbury found

---

[6] Although Foss had already given Dionne a two-week notice that he would be leaving Circuit City, he
apparently decided to stay if he could be transferred back to the South Portland store.  The reason Foss
gave for requesting the transfer is in dispute.  Plaintiff asserts that it was because he had been asked by
someone at the South Portland store to help out during the busy holiday season.  (Foss Dep. 64-65.)
Defendant asserts that Foss indicated that he wanted to work near his family home while on holiday break
from college.  (Dionne Aff. ¶ 24.)

Foss on the sales floor.  (Lounsbury Aff. ¶13.)  Lounsbury checked Foss's time record again and, at that time, Foss's time sheet indicated that he was working during the time Dionne and Lounsbury were looking for him.  (Dionne Aff. ¶¶ 29-30; Lounsbury Aff. ¶13.)

The Keene Circuit City store has surveillance cameras located at the entrance of the store and at each computer terminal.  (Hopkins Aff. ¶ 21.)  In order to determine whether Foss had recorded an accurate time for his arrival at the store that day, Lounsbury checked the video surveillance tape.  (Lounsbury Dep. at 21-22.)  After watching the tape, Lounsbury concluded that Foss had arrived at work at a time later than Foss had recorded on his time sheet.  (Lounsbury Dep. at 21-22.)  Lounsbury then notified Dionne and Hopkins of his conclusion.  (Lounsbury Dep. at 22.)  Dionne then asked Hopkins to investigate Foss's time sheets to determine the existence of, and the cause for, this potential discrepancy in Foss's time sheets.  (Dionne Aff. ¶ 30; Hopkins Aff. ¶ 19.)

Hopkins compared some of the times Foss entered on his time sheets from November 24 through December 14, 2005 with the store's videotape surveillance for those same days.[7]  (First Hopkins Aff. ¶¶ 20, 21; Second Hopkins Aff. ¶ 9.)  Hopkins determined that on at least six of the eleven days Foss worked during this timeframe, the

---

[7] Foss asserts that "Defendant has been unable to produce the surveillance tapes."  (Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 19.)  However, Plaintiff has not established that he requested that Defendant produce the surveillance video or how Defendant responded to that request. Defendant, without addressing the issue of whether the video still exists, explains that the surveillance video system at the Keene store contains a finite amount of space – approximately 45 days – and when the system runs out of space, it then automatically overwrites itself, eliminating the previously recorded video. (Affidavit of Michael Currier ¶¶ 4, 5.)  Fundamentally though, the content of the surveillance video itself relates only to the issue of whether Foss's time records accurately reflected the time that he worked and Foss is not claiming that his time records were accurate, only that he did not *intentionally* falsify the time records.  Therefore, the absence of the video surveillance from the summary judgment record seems inconsequential.

time listed on Foss's time sheets did not match the time Foss actually entered the Keene store.  (First Hopkins Aff. ¶ 22; Second Hopkins Aff. ¶ 10.)  Foss's time sheets showed that, on multiple occasions, he walked into the store and clocked in between ten and twenty minutes later than the time he entered on his time sheets.  (First Hopkins Aff. ¶ 23.)  Specifically, Hopkins determined that Foss entered inaccurate arrival times on six days including: (1) December 4 – Foss walked into the store at 1:07, arrived in his department at 1:12 and clocked himself in at 1:00; (2) December 5 – Foss walked into the store at 4:17, arrived in his department at 4:23 and clocked himself in at 4:05; (3) December 6 – Foss walked into the store at 4:02, arrived in his department at 4:08 and clocked in at 3:58; (4) December 8 – Foss walked into the store at 4:18 and arrived in his department at 4:22 and clocked himself in at 4:03; (5) December 13 – Foss walked into the store at 4:32, arrived in his department at 4:42 and clocked in at 4:00;[8] (6) December 14 – Foss walked into the store at 4:11, arrived in his department at 4:15 and clocked in at 4:05.  (Second Hopkins Aff. ¶ 10.) Hopkins concluded, based on her investigation, that Foss falsified his time sheets in violation of Circuit City's policies and procedures.  (First Hopkins Aff. ¶ 26; Hopkins Dep. at 12.)

Circuit City's Associate's Handbook contains a specific policy requiring associates to accurately record their hours worked.  (Associate Handbook at 10.)  Circuit City pays an associate based on the hours and minutes recorded by the associate on his or her time sheet.  (Dionne Aff. ¶ 19; Tobolski Aff. ¶ 26; Hopkins Aff. ¶ 17.)  Circuit City considers the misrepresentation or falsification of time sheet records to be a theft issue and an integrity issue.  (Dionne Aff. ¶ 34; Tobolski Aff. ¶ 28; Hopkins Aff. ¶ 27;

---

[8] The next day, Foss changed his time of arrival for December 13th from 4:00 to 4:15.  (Second Hopkins Aff. ¶ 10.)

Associate Handbook at 7 (setting forth Circuit City's policy requiring all associates to display the utmost integrity).)

Sometime in mid-December, Hopkins contacted Tobolski with the results of her investigation.  (Tobolski Aff. ¶ 25; Hopkins Aff. ¶ 30.)  Hopkins sent Tobolski the print out of Foss's time sheets from November 24, 2005 through December 7, 2005 and her notes regarding what she viewed on the videotape surveillance footage, which Hopkins had reviewed as part of her investigation.  (Hopkins Aff. ¶ 30-31.)  Tobolski instructed Hopkins to place Foss on administrative leave while Tobolski, as district human resources manager, completed her review on the investigation of Foss's time sheets.  (Tobolski Aff. ¶ 29; Hopkins Aff. ¶ 31.)  Tobolski also instructed Hopkins to obtain a written statement from Foss containing his account of the inaccurate time he entered on his time sheets.  (Tobolski Aff. ¶ 30; Hopkins Aff. ¶ 32.)

On December 15, Foss arrived at the store at 4:20 and Lounsbury told him to report to Hopkins.  (Foss Aff. ¶ 6.)  Hopkins informed Foss of her investigation into discrepancies in his time sheets and in the presence of another manager, Eric Jerman, Hopkins interviewed Foss.  (Hopkins Aff. ¶ 33.)  Hopkins asked Foss if he wanted to view the video surveillance, but Foss declined.  (Foss Dep. at 107; First Hopkins Aff. ¶ 39.)  During the meeting, Hopkins asked Foss to write out a statement containing his version of events related to these time sheet discrepancies.  (Foss Aff. ¶ 6; Defendant's Ex. 13.)  In the statement, Foss did not deny entering inaccurate arrival times on his time records, but he indicated that he did not intentionally misrepresent any hours. (Defendant's Ex. 13; Foss Dep. at 97-98.)  Foss never mentioned Lounsbury's behavior

to Hopkins nor did he indicate that there was a problem with Lounsbury in his written statement.  The meeting lasted approximately twenty minutes.  (Foss Aff. ¶ 6.)

Tobolski reviewed Hopkins's notes from the surveillance video and Foss's timesheets.  (Tobolski Aff. ¶ 31.)  Based on this review, Tobolski concluded that Foss had falsified his time sheets.  (Tobolski Aff. ¶ 35.)  Both Hopkins and Tobolski considered Foss's falsification of time sheets to be a violation of Company policy and theft from the company.  (Tobolski Aff. ¶ 27-28; Hopkins Aff. ¶ 27.)  Based on the investigation into the accuracy of Foss's timesheets, Tobolski and the managers of the Keene store made the decision to terminate Foss.  (Tobolski Aff. ¶ 36; Tobolski Dep. at 12.)  Tobolski had previously terminated sales associates for falsifying time records. (Tobolski Aff. ¶ 39.)  Dionne and Richard James, store director for the South Portland store where Foss initially worked, had previously recommended the termination of sales associates for falsifying time sheets.  (Dionne Aff. ¶ 36; Deposition of Richard James at 11-12.)  Lounsbury did not participate in the decision to terminate Foss's employment. (Tobolski Aff. ¶ 38; Hopkins Aff. ¶ 37; Lounsbury Aff. ¶ 16.)

Tobolski instructed Hopkins to inform Foss of the decision to terminate his employment with Circuit City.  (Tobolski Aff. ¶ 40; Hopkins Aff. ¶ 35.)  On December 17, 2005, Hopkins terminated Foss's employment with Circuit City.  (Tobolski Aff. ¶ 36; Hopkins Aff. ¶ 38; Foss Dep. 103-04.)

## III. DISCUSSION

### A. Sexual Harassment – Hostile Work Environment

Plaintiff contends that Lounsbury created a hostile work environment by continuously commenting on women's bodies or discussing topics of a sexually explicit

nature for the six weeks that they worked together at the Keene Circuit City store. Lounsbury denies, or cannot recall, directing any sexually inappropriate comments about women to Foss.  A genuine material issue of fact exists as to whether Lounsbury engaged in an offensive dialogue while working with Foss at Circuit City, however, for purposes of the instant motion, the Court will credit Foss's version of the events.  That is, Lounsbury constantly directed at Foss sexual or sexually suggestive comments about women.  Such commentary generally related to the breasts, legs and buttocks of female customers.  (Foss Dep. 54-55, 70.)  Lounsbury's vulgar commentaries began immediately after Foss started working at the Keene store.  In addition to this generalized commentary, Foss recounted specific instances of Lounsbury's inappropriate conversations with him.  Foss described six specific instances of Lounsbury's vulgar harassment.

Title VII prohibits "an employer" from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Discrimination based on sex which creates a hostile or abusive working environment violates Title VII.  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  To state a claim for sexual discrimination based on a hostile work environment under Title VII, Foss must show: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and

the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.  O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23 (1993); Meritor, 477 U.S. at 65-73).   In this case, Defendant challenges the last four elements of Plaintiff's hostile work environment claim.

### 1. Whether Lounsbury's Harassment Was Based Upon Foss's Sex

Same-sex harassment claims differ from those between males and females because the latter "typically involve[] explicit or implicit proposals of sexual activity," which create a presumption that the underlying conduct was based on sex.  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  However, this presumption is applicable only if there is credible evidence to show that the alleged harasser is sexually attracted to the plaintiff.  Id.  Oncale, the leading Supreme Court case on same-sex harassment claims, sets forth three potential evidentiary paths by which a same-sex plaintiff can show that the conduct was based on or because of sex.  Id. at 80-81.  First, a plaintiff can show that the conduct was motivated by sexual desire.  Id. at 80.  Second, a plaintiff can show that the harasser was motivated by a general hostility to the presence of the same gender in the workplace.  Id. And third, a plaintiff may offer direct comparative evidence about how the harasser treated both males and females in a mixed-sex workplace.  Id. at 80-81.

It is clear that harassment is not necessarily discrimination "because of sex," merely because the words used have sexual content or connotations.  Id. at 80.  Instead, the critical issue for a Title VII claim "is whether members of one sex are exposed to

disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. (quoting Harris, 510 U.S. at 25). Oncale also emphasizes that "whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" Id. at 81 (emphasis and alteration in original) (quoting 42 U.S.C. § 2000e-2(a)(1)).

In this case it is not alleged that Lounsbury is homosexual and motivated by sexual desire toward Foss. Nor is there evidence that Lounsbury was motivated by a general hostility to the presence of males in the workplace. To support his claim that Lounsbury's conduct was based on sex, Foss argues that Lounsbury treated males and females differently. Relying on his deposition testimony, Foss argues that "Lounsbury exposed males to disadvantageous terms or conditions of employment to which women employees were not exposed." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Docket # 28) at 13.) Defendant responds arguing that Plaintiff cannot establish that any of the alleged harassment occurred because Foss was a man under the comparative evidence test because Plaintiff "alleges that Lounsbury made these comments in front of both men and women." (Defendant's Motion for Summary Judgment at 6.) The Court agrees that Foss failed to meet his burden because the summary judgment record provides evidence that Lounsbury treated both males and females at Circuit City similarly.

Foss principally relies on his own deposition testimony to support his position that men and women were treated differently by Lounsbury. The Court does not find Foss's deposition testimony to clearly state that men were treated differently or support the

conclusion that men and women were treated differently.  On the contrary, when asked if he believed that the allegations against Lounsbury have anything to do with being a male, Foss responded stating:

> "I don't think he would have said what he said to a whole lot of women, unless it was directed at a guy.  He – when – there was only one specific incident that I can remember him actually saying something to a woman, and that was Laura Mann.  But that was directed at me.  If there was a woman present, *usually* he would not say anything; but the second she left, it was, you know, guys around."

(Foss Dep. at 129-30 (emphasis added).)   This statement does not support Foss's unqualified claim that Lounsbury made such comments only in the presence of men. Moreover, the statement does not preclude other evidence that women were present for Lounsbury's obnoxious comments.

The Court's review of the undisputed factual record reveals that of the nineteen days that Foss and Lounsbury worked together, Foss recalled three instances that Laura Mann was present for Lounsbury's vulgar comments.  The first instance, Foss described as follows: "Lounsbury picked up a piece of product wrap and walked up to a female employee, Laura Mann, saying Foss's girlfriend has lips like the product wrap. Lounsbury then gestured toward his crotch."  (Foss Dep. at 52; Plaintiff's Response to Defendant's First Set of Interrogatories at No. 16.)  Plaintiff's answers to interrogatories reveals two additional instances when it is likely that Laura Mann was in Lounsbury's presence when sexually explicit comments were made.  Foss indicated that Laura Mann may have been present when Lounsbury discussed the sexual habits of a woman that Foss was taking a bartending class with, and, on another occasion, Lounsbury said something to Mann that caused her to exclaim "that is gross" and then Lounsbury told Foss that:

"You're never going to have a chance with her now."  (Complaint ¶¶ 11, 14; Plaintiff's Response to Defendant's First Set of Interrogatories at Nos. 15 and 17.)

Viewing the record in the light most favorable to Foss, the Keene store was undoubtedly an unpleasant place to work during this time in the fall of 2005.  In determining what is actionable under Title VII, however, the Supreme Court stresses the importance of distinguishing between harassment and discriminatory harassment in order to "ensure that Title VII does not become a 'general civility code.'"  <u>Faragher</u>, 524 U.S. at 788 (quoting <u>Oncale</u>, 523 U.S. at 80).  The evidence in this case demonstrates that Lounsbury did not treat men and women differently, but that Lounsbury appears to have created an environment that was generally obnoxious to both men and women at the Keene Circuit City store.  The store was simply not a hostile workplace because Foss was a man.  <u>See</u> <u>McCown v. St. John's Health System</u>, 349 F.3d 540, 544 (8th Cir. 2003) (in same-sex hostile work environment case, plaintiff's express absence of knowledge of female employees being harassed found insufficient to generate a jury question as to whether harasser's conduct constituted discrimination "because of sex").   Since the summary judgment record does not raise an issue of fact as to whether Foss was singled out because of his race, there is no need for the Court to address the other challenged elements of Plaintiff's hostile work environment claim.  The Court will, therefore, grant Defendant's Motion for Summary Judgment on Foss's sexual harassment claim.

## B. Retaliation

Foss also contends that Circuit City retaliated against him for complaining about Lounsbury's offensive conduct.  Foss need not prevail on the underlying claim of discrimination in order to pursue his retaliation claim.  <u>Soileau v. Guilford of Maine, Inc.</u>,

105 F.3d 12, 16 (1st Cir. 1997) (citing Mesnick v. General Elec., Co., 950 F.2d 816, 827 (1st Cir. 1991)).   Title VII retaliation claims proceed under the familiar McDonnell Douglas burden shifting analysis.   McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   Under the McDonnell Douglas framework, the plaintiff must first present a prima facie case of retaliation.   Id. at 802.   Then, the burden of production shifts to the defendant to produce a legitimate, non-discriminatory justification for taking the action in question.   Id.   Finally, the burden shifts back to the plaintiff to show the defendant's reason for its action was merely a pretext for discrimination.   Id. at 804.

### 1. Prima Facie Case

To establish a prima facie case of retaliation, Plaintiff must show: (1) he engaged in protected activity under Title VII; (2) he was subjected to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.   See Gu v. Boston Police Dep't., 312 F.3d 6, 14 (1st Cir. 2002).   The First Circuit has provided that "the prima facie burden is 'quite easy to meet.'"   Hodgens v. General Dynamics Corp., 144 F.3d 151, 165 (1st Cir. 1998) (quoting Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir.1991)).   Circuit City refutes that Foss can make out a prima facie case of retaliation.

### a. Protected Activity

Title VII prohibits retaliation against an employee because he or she "has opposed any practice made an unlawful employment practice by" Title VII.   42 U.S.C. § 2000e-3(a).   Foss contends that he engaged in protected activity when he complained to Dionne and Tobolski about Lounsbury's conduct.   Defendant responds arguing that Foss never explicitly complained of a hostile work environment or that he was the victim of sexual

harassment.  The record is in dispute on this point.  However, viewing the evidence in the light most favorable to Plaintiff, the record supports the following facts.

Foss first told Dionne that he was uncomfortable working with Lounsbury because of Lounsbury's sexual commentary in late November or early December 2005. (Foss Dep. at 61-62.)  Dionne replied: "You know, John is John, and that's how he is." (Foss Dep. at 62.)  A short time later, Foss gave Dionne his two week notice explaining that he did not feel comfortable working with Lounsbury because of the way he spoke about women.  (Foss Dep. at 63-64.)  Dionne apparently agreed but again responded: "John is John."  (Foss Dep. at 63-64, 68-69.)  Later, Foss also complained to Tobolski in Human Resources that he had complained to Dionne about Lounsbury's sexual comments.  (Foss Dep. at 75.)  After not hearing from Tobolski, Foss called her back and left her a voicemail message indicating that he did not want to work with Lounsbury because of Lounsbury's conduct and that Dionne would not let him transfer to South Portland.  (Foss Dep. at 75-76.)  Accordingly, the Court finds that a reasonable jury could find that Foss engaged in protected activity when he complained to Dionne and Tobolski about Lounsbury's conduct.

Defendant also contends that Foss's complaints about Lounsbury's conduct are not protected activity because a reasonable person, similarly situated, could not reasonably believe that Lounsbury's conduct was unlawful.  Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001).  To support its position, Defendant relies on Jordan v. Alternative Resources Corp., 447 F.3d 324 (4th Cir. 2006).  The Court notes that the cited Jordan opinion has been withdrawn; however, the discussion of the issue, for which Defendant cites the withdrawn opinion, is substantially similar in the

subsequently filed decision that replaced the earlier opinion.  See Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir. 2006).  The Court finds the Jordan case distinguishable.

In Jordan, the plaintiff complained to his employer about a coworker's singular racist statement and, after the plaintiff was fired, he brought suit claiming that he was fired for making the complaint about the coworker's statement.  In discussing Jordan's retaliation claim, the Court stated the issue as "whether Jordan complained about an actual hostile work environment or, if there was not one, whether Jordan could reasonably have believed there was one."  Id. at 340.  After concluding that the isolated racial comment did not create a hostile work environment, the Court addressed the question of whether Jordan reasonably believed that the work environment was hostile.  On this point, Jordan argued that he had an objectively reasonable belief that Title VII was about to be violated because the coworker's conduct would have at some point ripened into a racially hostile work environment.  The Court found that "no objectively reasonable person could have believed that [Defendant's] office was in the grips of a hostile work environment or that one was taking shape."  Id. at 340-41.  Jordan is distinguishable from the instant case because, viewing the evidence in the light most favorable to Foss, Lounsbury's sexual commentary occurred every time they worked together whereas in Jordan only one racist statement was ever made to the plaintiff.  On these facts, it is objectively reasonable to conclude that Lounsbury's conduct was unlawful.

**b. Adverse Employment Action**

Next, Foss must show he was the victim of an adverse employment action constituting "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc., v. Ellerth, 524 U.S. 742, 761 (1998). The record clearly establishes that Foss was terminated and Defendant agrees that Plaintiff's termination qualifies as an adverse employment action.

**c. Causal Connection**

Foss must further show a causal connection existed between the protected activity and the adverse employment action. Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 84-85 (1st Cir. 2006). Foss alleges that he was fired on December 17, 2005, because he complained about Lounsbury's conduct in late November or early December 2005. Defendant responds that there is no causal connection between Foss's termination and any complaint of unlawful conduct because falsification of time sheets is a serious violation of Circuit City policy warranting immediate termination. Tobolski and Dionne deny that Foss ever complained to them, however, the record, viewed in the light most favorable to Foss, supports the conclusion that Foss was terminated within two weeks after complaining about Lounsbury's conduct.

The Court of Appeals for the First Circuit has held that "[a] showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988); Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases

that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (internal quotation omitted).   However, the First Circuit later refined its statement in Oliver stating that "chronological proximity does not by itself establish causality, particularly if "[t]he larger picture undercuts any claim of causation." Soileau, 105 F.3d at 16.

In Soileau plaintiff principally relied on the timing of the events – his termination occurred within one month of giving employer notice of his disability and requesting accommodation – to support his retaliation claim.   Id. The First Circuit affirmed the district court's grant of summary judgment in favor of the employer on plaintiff's retaliation claim.   In reaching its conclusion, the Court noted that the plaintiff was disciplined and warned of discharge if his performance did not improve and if he did not submit a performance plan and such discipline and warning occurred before the employer ever knew that plaintiff was asserting that he was disabled or before plaintiff requested an accommodation.   The Court stated that plaintiff's "narrow focus ignore[ed] the larger sequence of events," which "undercuts any claim of causation."   Id. Likewise, in Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, 425 F.3d 67, 85 (1st Cir. 2005), the Court affirmed the district court's grant of summary judgment in favor of the employer on plaintiff's claim of retaliation.   On appeal Ramirez argued that although his employer had concerns about his conduct in early 2000, he was not terminated until August 2001 and within two months after filing a charge of discrimination.  However, the record indicated that the performance basis for Ramirez's termination was documented in

May 2001 – one month before Ramirez engaged in the protected activity.  Here again the Court noted that "chronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'" Id. (citing Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003)).

There is no evidence in the record that Circuit City was investigating Foss's time records until after he complained about Lounsbury's conduct.  The evidence that Circuit City did not start to investigate Foss's time records until after he complained about Lounsbury's conduct and that Foss was terminated within two weeks of complaining about Lounsbury's conduct, creates a causal connection between the two events sufficient to establish a prima facie case.

### 2. Facially Nondiscriminatory Justification

Since Foss has established his prima facie case, the burden shifts to Defendant to proffer a non-discriminatory reason for its actions.  Circuit City has met this burden here by the evidence presented in the summary judgment record that Foss was terminated because he falsified his time sheets in order to conceal being late for work on numerous days.

Sometime in mid-December, after being notified by Dionne that Foss may be inaccurately recording his arrival time on his time records, Hopkins compared some of the times Foss entered on his time sheets from November 24 through December 14, 2005 with the store's videotape surveillance for those same days.  (First Hopkins Aff. ¶¶ 20, 21; Second Hopkins Aff. ¶ 9.)  Hopkins determined that on at least six of the eleven days Foss worked during this timeframe, the time listed on Foss's time sheets did not match the time Foss actually entered the Keene store.  (First Hopkins Aff. ¶ 22; Second Hopkins

Aff. ¶ 10.)  Foss's time sheets showed that, on multiple occasions, he walked into the store and clocked in between ten and twenty minutes later than the time he entered on his time sheets.  (First Hopkins Aff. ¶ 23.)  Hopkins concluded, based on her investigation, that Foss falsified his time sheets in violation of Circuit City's policies and procedures. (First Hopkins Aff. ¶ 26; Hopkins Dep. at 12.)   Based on the investigation into the accuracy of Foss's timesheets, Tobolski and the managers of the Keene store made the decision to terminate Foss.  (Tobolski Aff. ¶ 36; Tobolski Dep. at 12.)  Falsification of time records has lead to the termination of other Circuit City sales associates.  (Tobolski Aff. ¶ 39; Dionne Aff. ¶ 36; James Dep. at 11-12.)

### 3. Pretext

Since Circuit City has proffered a nondiscriminatory reason for its actions, the burden shifts back to Foss to demonstrate that the reasons given by the Defendant are pretextual and that his discharge was in retaliation for his reports of harassment.  Fennell v. First Step Designs, Ltd., 83 F.3d 526, 536 (1st Cir. 1996).  Plaintiff can meet his burden by showing that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual or unworthy of belief. A "nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason."  Hodgens, 144 F.3d at 168 (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  The same facts relied on to establish Plaintiff's prima facie case can support a showing of pretext.  "[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still

consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 143 (2000) (internal citation omitted and ellipses in original) (quoting Burdine, 450 U.S. at 255 n.10). The Court is mindful that it should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent. Hodgens, 144 F.3d at 167.

In this case, Foss has failed to proffer any direct evidence to show that the real reason for his termination was Circuit City's disapproval of his complaints that Lounsbury was creating a hostile work environment. Foss has, however, provided indirect evidence to generate an issue of fact as to whether Circuit City's stated reason was pretextual. While a jury could credit the proffered reasons of Circuit City, they could also credit Foss's evidence.

The evidence in the record indicates that it was approximately two weeks from the time Foss first complained to Dionne and Tobolski about Lounsbury's offensive behavior until he was terminated. In that two-week timeframe, the record supports the conclusion that the decisionmakers – Tobolski and Dionne – became aware that Foss felt harassed by Lounsbury's conduct and refused to take any action to remedy the situation. (Foss Dep. at 62 (When Foss told Dionne of Lounsbury's behavior, Dionne responded "You know, John is John, and that's how he is."); Foss Dep. at 68 (On another occasion that Foss complained to him, Dionne responded: "John is John.").) The fact that the summary judgment record supports the conclusion that the decisionmakers knew about Foss's complaints before terminating him raises an inference of retaliatory animus and distinguishes this case from Bennett v. Saint-Gobain Corp., ___ F.3d ___ (1st Cir.), 2007

WL 3227393.   In <u>Bennett</u> the Court affirmed the district court's grant of defendant's motion for summary judgment on plaintiff's employment discrimination claims finding no evidence of pretext.  In analyzing the pretext question, the Court stated that the inquiry "must focus on the motivations and perceptions of the actual decisionmaker."  <u>Id</u>. at * 6 (citing <u>Dávila v. Corporación de Puerto Rico para la Difusión Pública</u>, 498 F.3d 9, 16 (1st Cir.2007)).  Bennett's pretext evidence centered on the discriminatory animus of an individual supervisor that had no input into the decision to discharge him, whereas here Foss's pretext evidence supports a finding that Dionne and Tobolski – the decisionmakers – had knowledge of complaints about Lounsbury.

Tobolski and Dionne later agreed to transfer Foss and it was then, when Dionne went looking for Foss to tell him that he could transfer, that ultimately led to Dionne becoming aware from Lounsbury that Foss was falsifying his time records.  The "very close" temporal proximity between Foss's complaints and his termination and the fact that the decisiommakers knew about Foss's complaints and took no corrective action, if believed, could lead a reasonable jury to conclude that retaliation motivated Circuit City's conduct.  Defendant disputes these facts and inferences.  It is precisely this sort of material, factual disagreement which precludes summary judgment as to Foss's claim of retaliation.

### IV. CONCLUSION

Accordingly, the Court **ORDERS** that Defendant's Motion for Summary Judgment be, and it is hereby, **GRANTED** on Count I and **DENIED** on Count II.

/s/ George Z. Singal_____
Chief U.S. District Court Judge

Dated at Portland, Maine this 8th day of November, 2007.

26